**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH DAKOTA**
**SOUTHERN DIVISION**

| | |
|---|---|
| MORGAN BUTH-DOBIS and<br>DAVID DOBIS,<br><br>Plaintiffs,<br><br>vs.<br><br>SANFORD HEALTH;<br>SANFORD MEDICAL CENTER d/b/a<br>SANFORD USD MEDICAL CENTER; and<br>MARIA BELL, M.D.,<br><br>Defendants. | **COMPLAINT**<br>**AND DEMAND FOR JURY TRIAL** |

Plaintiffs Morgan Buth-Dobis and David Dobis, by and through counsel, and for their Complaint and causes of action against the above-named Defendants, state and allege as follows:

**PARTIES**

1. Plaintiffs Morgan Buth-Dobis and David Dobis (collectively "***Plaintiffs***"), husband and wife, are residents of Moorhead, Minnesota.

2. At all times relevant hereto, Plaintiff Morgan Buth-Dobis was a patient under the care of the respective agents, apparent agents, servants and employees of Defendants Sanford Health and Sanford Medical Center d/b/a Sanford USD Medical Center, including Defendant Maria Bell, M.D.

3. Defendant Sanford Health ("***Sanford Health***") is a South Dakota non-profit corporation with its principal office at 1305 West 18th Street, Sioux Falls, South Dakota.

4. Upon information and belief, Defendant Sanford Medical Center d/b/a Sanford USD Medical Center ("***Sanford USD Medical Center***") is a South Dakota non-profit corporation

with its principal office at 1305 West 18th Street, Sioux Falls, South Dakota. Sanford USD Medical Center operates a hospital at that same address.

5. Upon information and belief, Sanford Health was organized, in part, for the purpose of providing healthcare and the overall management and control of subsidiary, affiliate, or alter ego Sanford institutions and entities, including Sanford USD Medical Center.

6. Upon and information and belief, Defendant Maria Bell, M.D. ("***Dr. Bell***") is a resident of Sioux Falls, South Dakota, and is a physician licensed to practice medicine in the State of South Dakota.

7. Upon information and belief, at all times material to this suit, Dr. Bell was employed by Sanford Health and thus acted under the control and direction of Sanford Health and was an agent or apparent agent of Sanford Health.

8. Upon information and belief, at all times material to this suit, Dr. Bell had clinical privileges and/or was a member of Sanford USD Medical Center's medical staff and thus acted under the control and direction of Sanford USD Medical Center and was an agent or apparent agent of Sanford USD Medical Center.

9. Upon information and belief, Defendants Sanford Health and Sanford USD Medical Center (collectively, the "***Sanford Defendants***" or "***Sanford***") employed nurses, assistants, agents, apparent agents, servants and employees to provide healthcare and surgical-related care and treatment, and is responsible for their negligent acts and omissions.

10. The Sanford Defendants have institutional liability in their own right for their failures, acts and omissions administratively in the care provided to Plaintiff Morgan Buth-Dobis by its employees and agents.

## JURISDICTION AND VENUE

11. The amount in controversy between the Plaintiffs and Defendants exceeds the sum of $75,000, exclusive of interests and costs.

12. This Court has subject matter jurisdiction under the diversity of citizenship provisions of 28 U.S.C. § 1332. Additionally, and/or alternatively, this Court has supplemental jurisdiction.

13. Venue is proper in the District of South Dakota under 28 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims involved occurred in South Dakota.

## FACTUAL BACKGROUND

14. Plaintiff Morgan Buth-Dobis ("***Morgan***") was 30 years old when she was involuntarily and permanently sterilized by Dr. Maria Bell at Sanford USD Medical Center on March 18, 2025.

15. At the time of her surgery with Dr. Bell, Morgan was married to her high school sweetheart, Plaintiff David Dobis ("***David***").

16. Morgan and David had not yet decided whether they wanted to have children or not. However, Morgan was not taking birth control, and her and David had taken steps to accommodate having children in the future.

17. Morgan and David had talked about the financial aspect of having children, the possibility of having Morgan be a stay-at-home mom or work part-time, and the kind of schooling they would want their children to have.

18. When Morgan decided to go back to school, she chose a career in dental hygiene because she knew it would allow her the flexibility to balance work and family.

19. Morgan and David had also recently built a home next to her parents, which was designed to include space for a nursery. Morgan and her mom had several conversations about how easy it would be for her to watch Morgan and David's children because her mom was next door and worked from home.

20. Morgan and David had talked about how three kids felt like the perfect number of children and they created Pinterest boards for baby names, nursery decorations, gender reveal parties, baby showers, and parenting articles.

21. In the months leading up to Morgan's surgery with Dr. Bell, Morgan could not focus or put much thought into family planning because she was distracted by frequent lower abdominal and back pain, nausea, and constipation she was experiencing.

22. On February 27, 2025, Morgan was seen at Essentia Health for these symptoms. A CT scan and a pelvic ultrasound revealed an adnexal cystic mass on Morgan's right ovary. However, no abnormalities were detected on Morgan's left ovary or her uterus.

23. Apart from this cyst and related symptoms, Morgan was an otherwise healthy young woman. She had no significant pre-existing health history and no family history of reproductive cancer that she was aware of.

24. Following a repeat pelvic ultrasound and evaluation at Essentia Health, Morgan was referred to Dr. Bell for a surgical consultation on March 13, 2025.

25. In Dr. Bell's medical records for the consultation, she wrote that Morgan is "not wanting to preserve fertility. Her and her husband have no desire for children."

26. Morgan did not tell Dr. Bell that she did not want to preserve fertility or that she and David had no desire for children and Dr. Bell never directly asked Morgan for the answer to either question.

27. Before seeing Dr. Bell, Morgan first saw and briefly spoke with Emma Pickthorn, PA-C at the consultation appointment, who asked Morgan whether she was interested in preserving fertility. Morgan told her that she and her husband did not know and that she and her husband were unsure about having kids at the time.

28. The only time that Dr. Bell brought up the topic of fertility preservation or by extension, children, with Morgan was when she told Morgan that she could "take everything" if Morgan was not interested in preserving fertility.

29. Morgan felt immediately confused by Dr. Bell's statement about preserving fertility and taking "everything" and asked her what she meant, to which Dr. Bell said that she could remove both of Morgan's ovaries and fallopian tubes, her uterus, cervix, lymph nodes, a fat layer, and create a vaginal cuff.

30. Morgan immediately rejected Dr. Bell's recommendation to "take everything" and told Dr. Bell that she just wanted to focus on her right side and keep everything else.

31. Dr. Bell nodded as though she understood Morgan and proceeded to recommend a treatment plan that involved removing Morgan's right ovary and cyst and taking "cold samples" that would be sent to pathology.

32. Dr. Bell told Morgan that pathology would be able to tell Dr. Bell if the cold samples were "cancer or not" and if one came back as "cancer," Dr. Bell would remove the cancerous tissue, and it would be staged and graded. Dr. Bell never told or indicated to Morgan that healthy organs or tissue that were never identified as cancerous would be removed.

33. After mentioning the cold samples to Morgan, Dr. Bell then said she should remove both of Morgan's fallopian tubes because, according to Dr. Bell, more and more research is showing that ovarian cancer starts in the fallopian tubes.

34. Dr. Bell never explained to Morgan what preserving fertility meant and how it related to Morgan, the cyst, her right ovary, or her fallopian tubes.

35. Dr. Bell also repeatedly assured Morgan at the consultation that this would be an easy, same day procedure. Morgan even asked Dr. Bell about wearing compression socks and getting anti-nausea medication for the ride home that day.

36. Near the end of the consultation, Dr. Bell read off the surgical procedures that would be performed on Morgan while a registered nurse, Kelsey Anderson, wrote them down onto Sanford's "Consent for Surgery or Procedure" form as follows:


Laparoscopic right salpingo-oophorectomy, left salpingectomy, possible robotic, poss staging, poss omentectomy, frozen section, poss open, poss ureteral stents

37. Dr. Bell then left the room while Nurse Anderson went through the Consent for Surgery or Procedure form with Morgan.

38. While going through the form, Morgan told Nurse Anderson that she liked the plan because it meant her and David could still have kids.

39. Morgan also asked Nurse Anderson a few questions, including whether she would be able to conceive children naturally or would need "help," if that "help" would be IVF, and how her left ovary stays in place after the left fallopian tube is removed.

40. Before Morgan left her consultation, she was given a packet with instructions for her surgery and the following brochures: *How You Can Help Manage Your Pain*, *Your Stay at Sanford Health*, and *Laparoscopic Hysterectomy*. Morgan was told by Sanford's staff not to worry about the last brochure since it did not apply to her and the surgical plan she had agreed to.

41. Dr. Bell's description in the medical records of her surgical plan, shown below, is, in part, inconsistent with what she told Morgan at her consultation or what Morgan understood the surgical plan to be:

> laparoscopic unilateral salpingo-oophorectomy (the abnormal tube and ovary will be removed) and contralateral salpingectomy, possible robotic. We will send this mass for a frozen section, and if a borderline or invasive malignancy is found, we will proceed with surgical staging in the form of hysterectomy removal of remaining ovary, possible pelvic and paraaortic lymphadenectomy and omentectomy. She will be a same day surgery assuming no malignancy is found on frozen. She is interested in getting an antinausea prescription as well as pain meds upon discharge.

42. Dr. Bell never identified "borderline" as a potential diagnosis to Morgan and that word was never used once with her. Morgan was only ever told that the results from pathology would either be cancer or not cancer.

43. At the consultation, Dr. Bell did not explain or disclose to Morgan any other options or alternative treatment plans in the event of a borderline tumor, including, but not limited to, removing only the cyst, right ovary, and right fallopian tube.

44. Dr. Bell never told Morgan there would or could be "surgical staging" that would entail having a hysterectomy and the removal of Morgan's left ovary.

45. Dr. Bell never disclosed or explained any of the potential or actual reproductive consequences of removing *any* of Morgan's reproductive organs to her, including, but not limited to, menopause, the loss of the ability to conceive children naturally, effects on future pregnancies and biological children, or assistance that could be needed to build a family, such as IVF, egg freezing, or surrogacy.

46. Dr. Bell never disclosed or explained to Morgan that menopause increases a person's risk of developing various health conditions, such as heart disease, stroke, and

osteoporosis, or that Morgan could or would require long-term medical treatment due to the loss of hormones.

47. At her consultation, Morgan did not knowingly, voluntarily, or willingly agree that Dr. Bell could perform a hysterectomy, remove her left ovary, or perform any procedure other than the removal of the cyst, her right ovary, and her fallopian tubes.

48. On March 18, 2025, Morgan was admitted to Sanford USD Medical Center in Sioux Falls, South Dakota, at approximately 5:59 a.m. for surgery with Dr. Bell.

49. At approximately 6:50 a.m., Sanford's staff placed an IV in Morgan's right wrist.

50. Throughout the morning while Morgan was prepped for surgery, she was experiencing nausea, lightheadedness, and dizziness, and was feeling nervous for surgery. Morgan told the pre-operative nurse at Sanford several times about how she was going to be sick, that the room was spinning, and that she gets low blood sugar and will vomit or feel like passing out when she does not eat or drink in the morning.

51. By approximately 7:28 a.m, in addition to fluids, Sanford's staff had administered the following medications to Morgan: 1000mg of acetaminophen (Tylenol), 40mg of aprepitant (EMEND), 4mg of ondansetron (Zofran), 40mg of enoxaparin (Lovenox), 100mg of phenazopyridine (Pyridium), and a 1mg scopolamine patch.

52. At approximately 7:57 a.m., Morgan was presented with a new Consent for Surgery or Procedure form by a Sanford staff member, which appeared similar to the form she had signed on March 13, 2025, at her consultation with Dr. Bell.

53. When Morgan was presented with this new Consent for Surgery or Procedure form, she was told that they forgot to have her sign it at the consultation on March 13, 2025, and that Dr. Bell wanted her to sign it "just in case."

54. At this time, Morgan was reclined in a surgical hospital chair in a vented heating gown with an emesis bag next to her. She was still experiencing the same symptoms she had been reporting to Sanford's staff all morning, including nausea, lightheadedness, and dizziness.

55. Based on the representations made to her by Dr. Bell at her consultation and that this form was needed "just in case," Morgan believed it was a clerical issue, not a completely different surgical plan than what she agreed to.

56. However, the last-minute Consent for Surgery or Procedure form contained new medical jargon that, for the first time, authorized Dr. Bell to remove Morgan's left ovary and to perform a total hysterectomy, including removal of Morgan's uterus, cervix and other reproductive organs:


laparoscopic unilateral oophorectomy, bilateral salpingectomy with frozen section possible bilateral oophorectomy, possible hysterectomy, possible staging, possible open, possible robot, possible placement of bilateral ureteral stents

57. Dr. Bell did not discuss the new Consent for Surgery or Procedure form with Morgan or otherwise see or speak with Morgan at all before her surgery.

58. When Morgan asked a nurse when she would see Dr. Bell, Morgan was told Dr. Bell does not usually see her patients before surgery because she is in too much of a rush.

59. At no point in time before Morgan's surgery began did anyone, including Dr. Bell, ever explain to Morgan what would likely happen if Morgan did not sign the new consent form or explain the new procedures written on the new Consent for Surgery or Procedure form and what they entail, the recovery period, why such procedures would or could be necessary, alternative procedures or treatment options, the reproductive consequences of those procedures, or any other risks associated therewith.

60. At no point in time before Morgan's surgery began did anyone, including Dr. Bell, ever disclose or explain to Morgan what removing her left ovary would entail, the recovery period, why the procedure would or could be necessary, alternative procedures or treatment options, the reproductive consequences of the procedure, or any of the risks associated with the procedure.

61. At no point in time before Morgan's surgery began did anyone, including Dr. Bell, ever disclose or explain to Morgan what a total hysterectomy would entail, the recovery period, why the procedure would or could be necessary, alternative procedures or treatment options, the reproductive consequences of the procedure, or any of the risks associated with the procedure.

62. At no point in time before Morgan's surgery began did anyone, including Dr. Bell, ever ask her to describe the procedure she understood would be performed in her own words.

63. Morgan was not provided sufficient time or a meaningful opportunity to read, discuss, or understand the new Consent for Surgery or Procedure form, let alone the procedures it described in medical jargon, and how it might have varied from the first consent form she signed.

64. By 8:09 a.m., just 13 minutes after Morgan was presented with the new Consent for Surgery or Procedure form, Morgan was already in the operating room with anesthesia started.

65. At approximately 8:42 a.m., Dr. Bell began operating on Morgan.

66. By approximately 8:59 a.m., Dr. Bell had removed Morgan's right ovary, fallopian tubes, and the cyst, and sent them to pathology for a frozen section diagnosis.

67. At approximately 9:24 a.m., pathology informed Dr. Bell that the frozen section diagnosis was a "serous borderline tumor."

68. After being informed of the diagnosis, Dr. Bell proceeded to remove Morgan's left ovary and perform a total hysterectomy, among other procedures.

69. The final diagnosis for the cyst from pathology, which became available after Morgan's surgery was already complete, was a serous borderline tumor.

70. The first time Morgan heard the term "borderline" was when she received the pathology report with her final diagnosis. At that time, Morgan sent a message to Dr. Bell's staff on April 15, 2025, stating, "I just have a question about my diagnosis. Would someone be able to explain the findings of my pathology report? Does borderline mean it wasn't cancerous?"

71. A serous borderline tumor is a low-grade, non-invasive type of ovarian tumor that is considered to have low potential for malignancy.

72. Fertility sparing surgery is the preferred course of treatment for a serous borderline tumor when the patient is young or wanting to preserve fertility, like Morgan.

73. However, the procedure performed by Dr. Bell permanently sterilized Morgan and caused her to enter menopause at the age of 30.

74. Dr. Bell never told or explained to Morgan before her surgery that a serous borderline tumor was a potential diagnosis, what a serous borderline tumor is or how it is different from a malignant tumor, or the treatment options and alternatives for a serous borderline tumor, including, but not limited to, removing only the cyst, right ovary, and right fallopian tube and risks associated therewith.

75. Dr. Bell never told or explained to Morgan the relative inaccuracy and limitations of diagnosing benign, borderline, and malignant ovarian tumors through an intraoperative frozen section, including the likelihood of under and overdiagnosis of a borderline serous tumor.

76. Dr. Bell never disclosed to Morgan before her surgery that she would or could be permanently sterilized nor did she ever discuss with Morgan any of the options that would preserve Morgan's fertility or ability to have a biological child.

77. Dr. Bell also never disclosed to Morgan before surgery that she would or could enter menopause, the risk of long-term medical treatment for menopause and necessity of hormone medications, or the increased health risks associated with menopause, such as heart disease, stroke, and osteoporosis.

78. The procedure performed by Dr. Bell, including its effect of permanently sterilizing Morgan and causing surgical menopause, was neither necessary nor required to treat the serous borderline tumor, and did not meet the requisite standard of care.

79. If Morgan had been properly informed by Dr. Bell with regard to a possible borderline diagnosis, the treatment options and alternatives for a serous borderline tumor, or that Dr. Bell intended to remove Morgan's left ovary and perform a total hysterectomy, Morgan would not have proceeded with surgery and would have sought alternative options and opinions.

80. Morgan could not and did not knowingly, intelligently, or voluntarily consent to the procedure performed on her by Dr. Bell on March 18, 2025.

81. As a direct result of Dr. Bell's unauthorized procedure and Defendants' negligence, Morgan and David are unable to have biological children together and the only way they are able to have children at all is through adoption or surrogacy, both of which are costly.

82. As a direct result of Dr. Bell's unauthorized procedure and Defendants' negligence, Morgan has incurred and will likely incur in the future, expenses for medical care, and other expenses, including, but not limited to, costs for having children via surrogacy or adoption.

83. As a direct result of Dr. Bell's unauthorized procedure and Defendants' negligence, Morgan has experienced, and will likely experience in the future, pain and suffering, mental anguish, loss of enjoyment of life, disability, emotional distress, and anguish and embarrassment, amongst other damages.

**COUNT I: LACK OF INFORMED CONSENT**
**DEFENDANT MARIA BELL, M.D.**

84. Plaintiffs reallege the preceding paragraphs of this Complaint and incorporate them by reference as if fully set forth herein.

85. Morgan submitted herself to the care and treatment of Dr. Bell.

86. Dr. Bell owed Morgan a legal duty to make a full disclosure to her concerning Dr. Bell's choice of treatment and to obtain Morgan's informed consent before proceeding with her choice of treatment on March 18, 2025.

87. Average qualified members of the medical profession practicing Dr. Bell's specialty knew or should have known of the risks, potential consequences and alternatives to Defendant Bell's choice of treatment of Morgan.

88. Dr. Bell knew or should have known of the risks, potential consequences, and alternatives to her choice of treatment of Morgan.

89. Dr. Bell did not make a full disclosure to Morgan concerning the risks, potential consequences, and alternatives to Dr. Bell's choice of treatment and failed to obtain Morgan's consent, including, but not limited to, the following ways:

a. Failing to explain any of the potential or actual reproductive consequences of removing any of Morgan's reproductive organs to her, including, but not limited to, menopause and the loss of hormones, the loss of the ability to conceive children naturally, effects on future pregnancies and biological children, or assistance that could be needed to build a family, such as IVF, egg freezing, or surrogacy;

b. Failing to inform Morgan that a serous borderline tumor was a potential diagnosis;

c. Failing to explain to Morgan what a borderline serous tumor is and how it is different from a malignant tumor;

d. Failing to identify and explain to Morgan the potential treatment options for a serous borderline tumor other than removal of both ovaries, fallopian tubes, and a total hysterectomy;

e. Failing to disclose the relative issues with and limitations of solely relying on a frozen section diagnosis for purposes of determining whether to remove an ovary and perform a total hysterectomy;

f. Failing to discuss the second Consent for Surgery or Procedure form with Morgan;

g. Failing to explain to Morgan the new procedures that were added onto the second Consent for Surgery or Procedure form, what those procedures entailed, the recovery period, why the procedures could or would be necessary, the reproductive consequences of those procedures, the risks associated with those procedures, and alternative options and treatments;

h. Failing to inform Morgan that she would or could have her left ovary removed, what that procedure entailed, the recovery period, why the procedure could or would be necessary, the reproductive consequences of the procedure, the risks associated with that procedure, and alternative options and treatments;

i. Failing to inform Morgan that she would or could have a total hysterectomy, what that procedure entailed, the recovery period, why the procedure could or would be necessary, the reproductive consequences of the procedure, the risks associated with that procedure, and alternative options and treatments;

j. Failing to inform Morgan that she would go into menopause after removal of both ovaries and/or a total hysterectomy;

k. Failing to inform Morgan that menopause could or would require long-term medical treatment and hormone-related medications and leads to an increased risk of developing several health conditions, including, but not limited to, heart disease, stroke, and osteoporosis;

l. Failing to explain to Morgan that she would or could be permanently sterilized by the procedure on March 18, 2025; and

m. Failing to discuss any options or alternatives with Morgan that would have preserved Morgan's fertility or her ability to have a biological child.

90. The risks, potential consequences, and alternatives to Dr. Bell's choice of treatment of Morgan were material to a decision by her and a reasonable person in her position as to whether to undergo Dr. Bell's choice of treatment.

91. If Dr. Bell had informed Morgan of the risks, potential consequences, and alternatives to her choice of treatment of Morgan, neither Morgan nor a reasonable person in her position would have elected Dr. Bell's choice of treatment.

92. Morgan did not knowingly, voluntarily, or intelligently consent to the procedure performed by Dr. Bell on March 18, 2025.

93. As a direct and proximate result of Dr. Bell's failure to inform Morgan of the risks, potential consequences, and alternatives to Dr. Bell's treatment, Morgan has suffered and will continue to suffer severe and permanent physical injuries, physical pain, permanent disfigurement, impairment and disability, fear, humiliation, inconvenience, loss of the normal pleasures and activities of life to which she had been accustomed, and any other damages that may be further established at trial.

94. As a direct and proximate result of Dr. Bell's failure to inform Morgan of the risks, potential consequences, and alternatives to Dr. Bell's treatment and to obtain Morgan's informed consent, Morgan has incurred past medical bills and associated expenses, and will in the future reasonably incur damages for medical expenses and the cost of having children via surrogacy or adoption in amounts to be proven at trial.

## COUNT II: NEGLIGENCE
## DEFENDANT MARIA BELL, M.D.

95. Plaintiffs reallege the preceding paragraphs of this Complaint and incorporate them by reference as if fully set forth herein.

96. Morgan submitted herself to the care and treatment of Dr. Bell.

97. Dr. Bell owed Morgan a duty to exercise reasonable care in providing medical services to her.

98. Dr. Bell was negligent in the medical care and treatment that she provided to Morgan, including, but not limited to:

a. Failing to take any steps to preserve Morgan's fertility;

b. Unnecessarily removing Morgan's left fallopian tube;

c. Unnecessarily removing Morgan's left ovary; and

d. Unnecessarily performing a total hysterectomy on Morgan.

99. The acts described herein were a clear departure from good medical practice and constitute negligence.

100. Dr. Bell negligently, carelessly, and without regard for Morgan's health and well-being, treated Morgan in a manner resulting in Morgan's severe personal injuries and other damages.

101. As a direct and proximate result of Dr. Bell's negligence, Morgan has suffered and will continue to suffer severe and permanent physical injuries, physical pain, permanent disfigurement, impairment and disability, fear, humiliation, inconvenience, loss of the normal pleasures and activities of life to which she had been accustomed, and any other damages that may be further established at trial.

102. As a direct and proximate result of Dr. Bell's negligence, Morgan has incurred past medical bills and associated expenses, and will in the future reasonably incur damages for medical expenses and the cost of having children via surrogacy or adoption in amounts to be proven at trial.

## COUNT III: NEGLIGENCE
## DEFENDANTS SANFORD HEALTH AND SANFORD USD MEDICAL CENTER

103. Plaintiffs reallege the preceding paragraphs of this Complaint and incorporate them by reference as if fully set forth herein.

104. Morgan submitted herself to the care and treatment of Defendants Sanford Health and Sanford USD Medical Center.

105. The Sanford Defendants held themselves out to the public as providing the very best medical care and treatment available.

106. The Sanford Defendants owed Morgan a duty to exercise reasonable care in providing medical services to her.

107. The Sanford Defendants breached their duty of care to Morgan and were negligent in the medical care and treatment they provided to Morgan, including, but not limited to, the following ways:

a. Failing to monitor and supervise the physicians, nurses, assistants, agents, apparent agents, servants and employees under the direction and control of the

Sanford Defendants who were also responsible for Morgan's proper medical care and treatment, including, but not limited to, explaining procedures, treatment, risks, and alternatives, and obtaining Morgan's informed consent;

b. Presenting Morgan with a new and different Consent for Surgery or Procedure form after she had been prepped for surgery and minutes before taking her to the operating room;

c. Failing to ask Morgan to describe the procedure she understood would be performed on March 18, 2025, in her own words;

d. Failing to properly and skillfully provide Morgan with acceptable medical and nursing care; and

e. Failing to monitor and supervise Dr. Bell.

108. The acts and omissions of the Sanford Defendants as described herein were a clear departure from good medical practice and constitute negligence.

109. The Sanford Defendants negligently, carelessly, and without regard for Morgan's health and well-being, treated Morgan in a manner resulting in severe personal injuries.

110. As a direct and proximate result of the Sanford Defendants' carelessness, unskillfulness, negligence, and improper care and treatment, Morgan has suffered and will continue to suffer severe and permanent physical injuries, physical pain, permanent disfigurement, impairment and disability, fear, humiliation, inconvenience, loss of the normal pleasures and activities of life to which she had been accustomed, and any other damages that may be further established at trial.

111. As a direct and proximate result of the Sanford Defendants' negligence, Morgan has incurred past medical bills and associated expenses, and will in the future reasonably incur

damages for medical expenses and the cost of having children via surrogacy or adoption in amounts to be proven at trial.

**COUNT IV: LOSS OF CONSORTIUM**
**ALL DEFENDANTS**

112. Plaintiffs reallege the preceding paragraphs of this Complaint and incorporate them by reference as if fully set forth herein.

113. At all times relevant hereto, Morgan and David were married.

114. As a result of the acts of the Defendants, David was caused to suffer loss of consortium, loss of society, affection, assistance, and conjugal fellowship, all to the detriment of the marital relationship.

115. All of the aforesaid injuries and damages were caused directly and proximately by the conduct of the Defendants.

116. As a direct and proximate result of the conduct of Defendants, their agents and employees, David has suffered and will suffer in the future, special, general and other damages in an amount to be determined by the trier of fact.

**COUNT V: RESPONDEAT SUPERIOR/AGENCY/ENTERPRISE LIABILITY**
**DEFENDANTS SANFORD HEALTH AND SANFORD USD MEDICAL CENTER**

117. Plaintiffs reallege the preceding paragraphs of this Complaint and incorporate them by reference as if fully set forth herein.

118. The Sanford Defendants, by their agents, servants, or employees, represented and held themselves out to the public to be skilled in the treatment of various illnesses and conditions, and, in particular, that they were knowledgeable, safe, competent, and qualified to diagnose and treat Morgan's condition.

119. Morgan submitted herself to the care and treatment of the Sanford Defendants, by and through their respective agents, servants, or employees, who negligently, carelessly, and

without regard for Morgan's health and well-being, treated Morgan in a manner resulting in her severe personal injuries and other damages as described hereinabove.

120. The injuries sustained by Morgan were the direct and proximate result of the carelessness, unskillfulness, negligence, and improper care and treatment by the Sanford Defendants, and their respective agents, servants, or employees, as described hereinabove.

121. As a direct and proximate result of the negligence, carelessness, and unskillfulness of the Sanford Defendants, by and through their respective agents, servants, or employees, Morgan has suffered and will continue to suffer severe and permanent physical injuries, physical pain, permanent disfigurement, impairment and disability, fear, humiliation, inconvenience, loss of the normal pleasures and activities of life to which she had been accustomed, and any other damages that may be further established at trial.

122. The negligence of the Sanford Defendants' respective employees and agents, including physicians, nurses, physician assistants, and surgical assistants were taken while acting with actual or apparent authority of the Sanford Defendants, rendering them liable for the damages alleged herein under the doctrines of *respondeat superior*, agency, and enterprise liability.

## COUNT VI: DECLARATORY JUDGMENT
### ALL DEFENDANTS

123. Plaintiffs reallege the preceding paragraphs of this Complaint and incorporate them by reference as if fully set forth herein.

124. SDCL § 21-3-11 purports to limit the amount of general damages that may be recovered by a plaintiff in a medical malpractice action, such as Plaintiffs here, to $500,000.00.

125. SDCL § 21-3-11 does not take into account the number of parties to an action, the age of a plaintiff, the severity of injuries suffered by a plaintiff, the permanency of injuries suffered

by a plaintiff, or increases to the cost of living and changes to the value of the dollar that has occurred over the last 40 years.

126. The substance of SDCL § 21-3-11, including the $500,000 cap, has remained unchanged since the statute was first adopted by the South Dakota Legislature in 1976.[1]

127. SDCL § 21-3-11 violates Plaintiffs' due process rights under Article VI, Section 2 of the South Dakota Constitution by abolishing a vital portion of Plaintiffs' property right without providing a commensurate benefit or alterative remedy to Plaintiffs in return.

128. By mandating that a court override a jury's verdict and substitute a pre-determined, legislatively fabricated dollar amount, SDCL § 21-3-11 converts the jury trial into an empty, symbolic exercise for the most severely injured plaintiffs in violation of Plaintiffs' right to trial by jury under Article VI, Section 6 of the South Dakota Constitution.

129. SDCL § 21-3-11 creates an arbitrary and discriminatory classification scheme in violation of the right of equal protection guaranteed to Plaintiffs under Article VI, Section 18 of the South Dakota Constitution by treating medical malpractice victims differently than victims of other personal injury torts, favoring negligent healthcare providers over all other classes of tortfeasors, and fully compensating those with minor injuries as a result of medical malpractice while heavily penalizing those who suffer catastrophic and permanent harm.

130. By arbitrarily determining the amount of general damages Plaintiffs may recover, SDCL § 21-3-11 operates as a partial legislative closure of the courtroom doors and deprives Plaintiffs of the "right and justice" guaranteed by Article VI, Section 20 of the South Dakota Constitution.

---

[1] In 1986, SDCL § 21-3-11 was amended to cap *all* damages at $1,000,000.00. In 1996, the South Dakota Supreme Court held that this amendment was unconstitutional, which decision returned the statute to its original form.

131. There is no empirical or logical connection between capping a catastrophically or permanently injured person's recovery at an amount set 40 years ago for a healthcare crisis that existed 40 years ago.

132. SDCL § 21-3-11 is unenforceable to reduce Plaintiffs' award of general damages from the jury in this action.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request a judgment against Defendants as follows:

1. For full and fair compensatory, general, and special damages in an amount to be determined by the jury to compensate Plaintiffs for all injuries sustained as a result of Defendants' conduct;

2. For Plaintiffs' costs and disbursements herein;

3. For pre- and post-judgment interest to the fullest extent allowed by law; and,

4. For such other and further relief as deemed just and equitable by the Court, including, but not limited to, punitive damages and attorney's fees.

## PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY

Dated this 14th day of September, 2026.

CUTLER LAW FIRM, LLP

*/s/ Michael D. Bornitz*

Michael D. Bornitz
Abigale M. Farley
140 North Phillips Avenue, 4th Floor
PO Box 1400
Sioux Falls, SD 57101-1400
Telephone: (605) 335-4950
Email: mikeb@cutlerlawfirm.com
Email: abigalef@cutlerlawfirm.com
*Attorneys for Plaintiffs*

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Morgan Buth-Dobis and David Dobis

**(b)** County of Residence of First Listed Plaintiff ____________
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Michael D. Bornitz and Abigale M. Farley
Cutler Law Firm, LLP
140 N. Phillips Ave., 4th Floor, Sioux Falls, SD 57104

## DEFENDANTS

Sanford Health; Sanford Medical Center d/b/a Sanford USD Medical Center; and Maria Bell, M.D.

County of Residence of First Listed Defendant Minnehaha
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [x] 4 |
| Citizen of Another State | [x] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [x] 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
28 U.S.C. 1332

Brief description of cause:
Medical malpractice

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ____________ DOCKET NUMBER ____________

DATE: September 14, 2026

SIGNATURE OF ATTORNEY OF RECORD: /s/ Michael D. Bornitz

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______